Judge Mills
delivered the opinion of the court.
On the twenty-seventh day of June, 1795, William May sold to Thomas Carneal, twenty-four different tracts of land, supposed to contain twenty-three thousand two hundred and fifty six acres, for the sum of twenty-one hundred and fifty pounds. Carneal gave his obligation for the purchase money, and also, afterwards, on the fifteenth day of May, 1799, executed to said May a mortgage to secure the purchase money, on several negroes, and divers tracts of land, a few of which are some of the same tracts first sold by May to Carneal. May, at the date of the sale, executed to Carneal a conveyance for all the lands so sold him, warranting the lands against himself and heirs only, and not against other claims. Also, at the same period of the original contract, the parties entered into articles of agreement, which refer to the deed of the same date, and declare that Carneal took the claims at his own risque, as to the validity of title, and expresses that some of the tracts of land so sold were entries only, and not carried into grant, and that Carneal took upon himself the expenses of completing the titles, and paying further taxes; and that May, on his part, was only to furnish said Carneal with copies of each and every entry on which the claims were founded, *588 copies of the plats and certificate of surveys of all such tracts as had been surveyed, and the patents of all those for which patents had issued, together with the writings obligatory, by which he (May) claimed an equity in any of the tracts in which he held an equity only; and having done that, it was to be considered that May had complied with his part of the contract. After making sundry other provisions, relative to the purchase money, the following clause is inserted, to wit: “And lastly, it is agreed on by the said “Thomas, that the said May has a lien on the whole “of the property sold by him, and the same is acknowledged by the said Thomas, that is to say, the twenty-three thousand and two hundred and fifty-six acres in “twenty-four tracts, as will appear by having reference to “the deed given by the said May and wife unto the said “Thomas, of even date to this article, the whole being held “as a security for the payment of the purchase of twenty“one hundred and fifty pounds."
On the 20th of February, 1797, May furnished to Carneal the entries, surveys and patents, stipulated to be given or furnished by the afore-recited contract, and Carneal executed his receipt acknowledging the receipt of all that May was bound to furnish. Part of the purchase money stipulated to be paid, was to be paid in hand; and Carneal went on at different times to make partial payments, of which the parties had settlements, the details of which need not be here recited. Among the numerous tracts so sold and conveyed, was a tract or entry of 6000 acres on Rough creeks which has given rise to this controversy. This entry was made in the name of Benjamin Stevens, and is stated and represented in the deed, and other writings first entered into, to bear date the 15th March, 1764, and the original entry is, in fact, of that date, and was the one produced to Carneal in fulfilment of the contract by May on the 20th February, 1797, for which, among others, Carneal gave the aforesaid receipt, acknowledging the discharge of the, contract. To one moiety of this entry, May was entitled equitably for location or otherwise; and this moiety was included in the conveyance or contract with Carneal. Stevens, the original claimant of the entry, assigned the remaining moiety, or his right in the entry, to Ralph Philips, who, for the future in this history, stands in the place of Stevens.
On the 20th of February, 1797, Carneal and Philips had *589 a survey made on part of said entry in the name of Stevens, and obtained a patent therefor, being the quantity of 2,800 acres, bearing date 8th March, 1806, leaving 3,200 acres of said entry not surveyed. This survey and patent appears to be on the same warrant with the entry of the 15th March, 1784, in the name of Stevens, and on the same entry. On the 25th of January, 1809, Carneal gave May a written notice, in the form of a letter, informing him that he had, a short time past, discovered that the entry of the 15th March, 1784, had been amended so as to change its ground, on the 7th of February, 1786; that thereby the entry was lost; that older grants covered the ground of the amendment; and claiming of May the value, of the tract so lost; and also intimating that the said May being the locator, and having amended the entry, was liable to Philips, the holder of Stevens’ half, on account of the land being endangered, or lost, as well as to himself, because the original entry was the one sold, as well as the one produced on account of the contract, for which a receipt was given. On the same day, when this notice was given, the parties, May and Carneal, settled their accounts and partial payments in discharge of Carneal’s bond, and fixed the balance due to be l. 1335 10 2, bearing interest at six per centum per annum from the 7th June, 1808, which account and settlement is filed, and on the back of it, at the same date, the parties endorsed and signed a writing to this effect:
"Thomas Carneal and William May doth agree as followeth, to wit—that whereas, the said May did sell Thomas Carneal one equal moiety of an entry of land for "6000 acres, entered with the surveyor of Nelson county " in the name of Benjamin Stevens, on the 15th March "1784; and whereas, an amendment was made to the said “entry on the 7th February, 1786, in substance amounts to “a withdrawal and a total loss of the land; and whereas, in “the sale of said entry no notice was taken of the said amendment by the said May, having slipped his memory. “And the said May being desirous that the said Carneal “shall not be a looser is consequence of this oversight, the “said May do by these presents agree to allow him a credit “of five-hundred and thirty-four pounds, first cost and interest up to the 27th June last past, and the same is credited in the within account and settlement, and the said “Carneal is to have no further nor hereafter claim, against “the said May, case of the loss of the said entry." That the *590 entry was amended so as to change the ground, is not only shewn in this cause by the foregoing writing, but by a copy of the amendment filed together with the original entry. Perhaps at the same time, (for at what time does not distinctly appear) it seems that there was an understanding took place between May and Carneal, that Carneal should procure Philips’ interest for May in the entry aforesaid; and it was by letter from Carneal to May, previously hinted to May, that Philips, who was the owner of Stephens’ interest, contemplated holding May responsible as locator for the the loss of the entry by the amendment. Carneal accordingly received from Philips an assignment of his whole inteterest in the entry dated the 22d June, 1809, for which he, gave his note for $750. A copy of this assignment was transmitted to May by Carneal in ,a letter dated on the 1st February, 1810, in which,he is told that the assignment is for his benefit, or that “he is to have the benefit of it, upon the same terms he had the other moiety,’’ and that if he adjudged it insufficient, a better one should be procured, or that whatever was necessary should be done. Accordingly, on the 22d June, 1810, another credit is given on the bond from Carneal to May, for another l. 534, to operate as a payment on the 27th June, 1808 — and on the same day, in the hand writing of Carneal, an assignment was written and signed by him on the same paper containing the assignment from Philips to Carneal, assigning to May all the whole entry. But this assignment is now found filed in the register’s office cancelled and obliterated, but yet so plain that it can be read, accompanying a plat and certificate of survey for the 3200 acres, the balance of the 6000 acres, after 2800 acres, the first patent, is deducted, and the patent for, said 3200 acres issued to Thomas Carneal entirely, dated 19th September, 1810, and no title was made to May during the life of Carneal, except that, on the 10th September, 1810, the said Carneal, by deed executed for himself and and as agent for Ralph Philips, conveyed the whole of said 2800 acre patent, issued to Carneal and Philips jointly; in which conveyance Carneal binds himself to be responsible for all damages in case the said Philips or his heirs shall ever claim or recover the land.
After the death of Carneal, which took place shortly after the last named conveyance to May, he, May, filed bill against Carneal’s heirs and administrators, to foreclose, the mortgage for the balance of the price due for the lands, in *591 the Fayette circuit court, suggesting in his bill that the last named credit which was given for Philip's moiety of the 6,000 acre tract of land was a mistake, and ought not to have been entered on the bond. An answer was put into this bill without oath, signed by James Coleman for himself and the other defendants, he, the said James Coleman, being the administrrator of the state, and the stiling himself special guardian for Abicia D. Carneal, another heir, now the wife of James D. Breckenridge. In this answer, the mistake is admitted, and the cause proceeded to immediate trial on the filing of the answer, and thereupon that court decreed the whole balance due on the bond to be paid exclusive of the last named credit, and that if the money with interest was not paid on the first of October, then next following, the decree being rendered in August, 1811, then the equity of redemption in the slaves and other estate should be barred and foreclosed, and commissioners were, in the same decree, appointed to sell the mortgaged estate, and out of it to satisfy the debt, interest and costs of suit. The decree then expresses that the commissioners were to “report and certify to the court their proceedings therein, that such other and further decree might be made, as the court should deem proper. And that the question of costs and the final decree was reserved until the coming in of the report.”
This decree and suit appears still to remain in the Fayette circuit court, still in the same situation without further order or decree. But on the 9th May, 1812, by a writing on a copy of said decree, May assigned over all his right, title and interest to said decree to said J. Coleman, and authorised him to act in the premises, and proceed in said decree as he himself could do, and expressing on the face of said assignment that it was for, and in consideration of, the full amount specified in the decree paid to him by said James Coleman, in his individual capacity, and not as administrator.
After this, and before the commencement of this suit, the said James Coleman appears, by order of the county court, who granted the administration, to be ousted from the administration of the estate, ahd letters of administration de bonis non was granted to Thomas Davis Carneal, another heir.
But it appears that said Thomas Corneal, in his life time, on the 22nd March, 1805, in a letter to James Love, (which *592 letter appears to be addressed in answer to one first written by Love,) writes to this effect: — “I proceed to reply to you. and I observe what you say with respect to surveys which you have by you, and some want of warrants located to fill them with. I have part of a warrant of 6000 acres you mention, and only about 2800 acted on. The balance stands entered. If you think proper, you may act on the balance, and this shall authorise you to do so. The surveys must be made out in the name of Ralph Philips and Thomas Carneal, assignee of Benjamin Stevens. I will give you one equal half of the lands recovered, whatever it may be. This I believe common. Indeed custom has almost become a law in this case. I have a quantity of other warrants standing on the same ground with this, which you can have on the same terms, if you think proper This writing or letter, dated on the 10th January. 1809, was assigned by said Love to Kimbal Carlton and John Nugent, and by them on the 10th September, 1811, assigned without recourse to Thomas Reynolds and Samuel M’Guffin, who reside on the land. A patent issued on the 19th September 1812, for the said 3200 acres to Thomas Carneal as above Stated; but the date of the survey, as recited in the patent, bears date 20th February, 1797, and purports to have been made on the amended entry of Stevens’ warrant, bearing date 7th February, 1786. In answer to a bill filed by Ki tubal Carlton and J. Nugent, while they held the letter from Thomas Carneal to Love, against the said Carneal, he said Carneal admits that he has always been ready to convey the undivided moiety of a tract of land mentioned in the letter dated 22d March, 1805, and on which there appeared an endorsement to said Carlton and Nugent, and declares he is willing to make the conveyance at any time when called upon. He adds, that he had no recollection of ever having seen the letter from the time he wrote it till the date of that answer, which appears to be sworn to and filed on the 29th June, 1810.
At the same date on which May assigned over his decree in the Fayette circuit court on the mortgage to James Coleman, he represented to him that he was certainly entitled to the whole of said 3200 acre patent by virtue of his rescision with Carneal, and purchase of Philips through Carneal, above detailed, and that the assignment, before alluded to in the register’s office, ought never to have been erased, and that the patent ought to have issued to him. In *593 consequence of these statements Coleman having purchased and received a conveyance of the interest of Thomas Davis Carneal in his fathers estate, and claiming his wife's share, executed a conveyance of the whole tract by himself, and as attorney in fact for Breckenridge and wife; but not executed by his own wife. On this conveyance said May brought his ejectment in the Breckenridge circuit court, and obtained a judgment therein against the said Reynolds and M'Guffin, claiming under the letter of Carneal to Love. To avoid this judgment said Reynolds and M'Guffin, filed this bill against Carlton, Nugent and Love, their assignors, and against said May and the heirs of Carneal, with an injunction, charging May with notice of their claim before his deed from Coleman, relying on the aforesaid letter, and Carneal's answer to the bill of Carlton and Nugent, and praying a conveyance of the tract of land of 3200 acres or a moiety thereof, and if they failed in this, compensation against Carneal's heirs. To this bill May answered resisting their claim, and denying notice before his conveyance from Coleman, except by report; admits his conveyance is incomplete; but contends that if he must lose the land, that Carneal's estate ougth to be made responsible to him. He accordingly extends his answer in the nature of a cross bill, setting out the whole of the foregoing matter between Carneal and himself, as above detailed, prays an answer thereto, and that if Reynolds and M'Guffin get any part of the land, he may recover against Carneal's estate the amount of his two credits, on Carneal's bond of l534, each with interest. Carneal's heirs respond to the bill of Reynolds and M'Guffin, rather favorably, and also extend their answer in the nature of a cross bill against May, alleging he has recovered too much money on his mortgage in the Fayette circuit court, and pay for a decree for it back again. They contest many of his allegations, and thus while Reynolds and M'Guffin are endeavoring to coerce their equity for the land, May and Carneal's heirs interplead in the same suit, and travel over all the transactions between May and Carneal, relative to said 6000 acres of land. The circuit court took up the cause at one term as between the complainants, Reynolds and M'Guffin, and defendants, and decreed to said complainants, Reynolds and M'Guffin, the one moiety of the tract of 3200 acres. At the same term the court admitted May's answer to the answer of Carneal's heirs, which had never previously been *594 filed, and continued the cause as between Carneal's heirs and May, and at a term long subsequent, heard the cause as between May and Carneal’s heirs, and gave a decree in favor of May, that he recover against them the said two credits of l.534 each, with interest, and that the whole contracts by which May repurchased the moiety of Philips, as well as that of Carneal in the 6000 acre tract, should be rescinded.
Two distinct decrees rendered at different terms, tho’ in the same suit, cannot be embraced in one writ of error.
By the assignment of error, and also by the names of Reynolds and M’Guffin being inserted in the writ of error, it seems that Carneal’s heirs, who have brought the cause before this court as plaintiffs, have intended to try the merits of both decrees, to wit, that between Reynolds and M'Guffin and the defendants, as well as that between May and Carneal’s heirs. But these decrees are distinct and different from each other, rendered at different times, and each of them final; so that they cannot be comprehended in a joint writ of error. Besides, we view the present writ of error as a writ to the decree between May and Carneal’s heirs only. For although it includes the names of Reynolds and M’Guffin, yet that is by ,way of description only, and in other parts it describes the decree between May and Carneal’s heirs; and that decree only is now before this court. The decree between Reynolds and M’Guffin and Carneal’s heirs, have given to the complainants one moiety of the tract of 3200 acres, and we are relieved from deciding the question as to their right to it against the heirs of Carneal, or against the equity of May to the same land, and shall only enquire into the redress, if any, which May is entitled to against Carneal's estate. It is contended in the pleadings by Carneal’s heirs, that, although May gave to Carneal a credit for l. 534, with its interests, on acount of the removal of the entry, for Carneal’s moiety, yet Carneal was to keep the entry or land itself, and the credit was only to be considered as an abatement of so much of the purchase money in the whole contract, for the supposed injury caused by the amendment of the entry. And, indeed, the expressions in the agreement of 1809, seem to favor this idea. The expressions on which the reliance is placed are in these words: “and the said Carneal is to have no further nor hereafter claim against the said May, in case of the loss of said entry." But these may receive a construction consistent with the obligations on Carneal to restore the entry or land. In the body of the writing, the parties *595 express what they mean by the loss, and say that the amendment amounts to a withdrawal and total loss of the land. This, then, was the loss, for which May was not to be further responsible; and the words “in case” may be construed to intend the same as “on account of." Taking the expressions, then, as applying, not to a future, but former loss, expressed in the writing, the words amount to an acquittance on the part of Carneal to May, that he will set up no further claim on account of the withdrawal or amendment of the entry. The contract between May and Carneal, as to the moiety of the 6000 acre tract of land; was completely rescinded; and, on that rescision, it would become the duty of Carneal to restore the land. Such would be the consequence without any stipulation to that effect; and it would lie in the representatives of Carneal to prove that. there was an understanding that Carneal should not reas sign the claim; and this they have not done. But this matter is not left to inference. Carneal, in a subsequent letter to May, which has been recited, declares to May that “he is to have the benefit,” of Philips' moiety, “upon the same terms he had the other,” to wit, his, Carneal's, moiety. This shews that May was to have the entry back, such as it was; and it is reasonable to conclude, that if May had then known that Carneal had gotten the land surveyed, and that he had actually sold the half to Love, under whom Reynolds and M’Guffin claims, he never would have taken back that which he could not get, because Carneal had parted with it. And further, it seems that Carneal intended this, when be made the assignment to May of the plat and certificate, which has been obliterated, and from whatever cause it may have been erased, if it had stood it would have given May no more than he was actually entitled to, It follows, then, that May could have made no fraudulent representations to Coleman, as has been alledged on the part of Carneal's heirs, to induce Coleman to make him the conveyance which was last made; and that by said conveyance, had it passed a complete legal estate, he would have been entitled to have keep it. But as that estate so conveyed by Coleman, whether complete or incomplete, has been partially defeated by the claim of Reynolds and M'Guffin which riginated from Carneal himself, it follows that May has his election not to take any part of Carneal’s moiety of the whole 6000 and is entitled to a decree for its value, and its interest, as the court below has decreed *596 unless he has since done some act which deprives him of it, For this purpose his decree in the Fayette circuit court, including l. 534 too much, which is the exact value of Carneal’s moiety of the 6000 acres, and his assignment or conveyance of that decree to Coleman, in which he acknowledges the consideration of the amount of the whole decree, as the consideration for which he transferred or conveyed, is relied upon. And it is contended in the answers, as that transaction was fair, the expression of the whole amount, by way of consideration, estops May from saying that he did not receive the whole amount in money. Hence it would follow, that if that writing is conclusive against May, as he then received l. 534 too much, he ought not to receive an equal sum now.
On rescinding a contrac, the law implies that each, party is to be placed in statu quo, and it lies on the party resisting this inference to make his case clearly cut.
If conveyance be made of a tract of land after a previous sale of a part, the option devolves on the second purchaser to keep the part he can get, and go for the part before sold, or he may reject the whole & seek entire compensation.
Although parties to a deed cannot impeach the consideration expressed, yet they may shew it was paid in property and not in money.
It is a well settled general rule, that the parties to a deed cannot contradict and impeach the consideration stated on its face, unless on account of fraud in the writing or execution of the deed, or some mistake has crept into the transaction. But it does not thence follow that the parties pay not shew that the consideration, expressed as a sum certain, was not received in money, but in other articles valued at the time by the parties to that amount of money, of which the consideration was composed. Hence we conceive, that May, in the present case, ought to be permitted to shew that part of the sum expressed by him to be received in his deed of transfer to Coleman, was in money, and the remaining part in the tract of 3200 acres of land in question, half of which is now decreed to Reynolds and M’Guffin. It seems very evident from the proof, that he was to have had from Thomas Carneal, in his lifetime, this tract of land at l. 534, with its interest, and that he actually gave Carneal a credit for that sum upon his bond; but that he never did receive from Carneal, in his lifetime, a conveyance or assignment of the title. It also appears that on the same day that he made a transfer to Coleman of the decree and mortgaged estate therein mentioned, a deed of Conveyance was prepared from Coleman to him for the 3200 acres of land, and either then, or shortly after, executed by Coleman, being the very land now decreed to M'Guffin: Coleman also acknowledges, in a written statement, that be paid no more money in consideration of the conveyance or transfer of the mortgaged estate, than what May in his bill and answer alledges, being the exact balance after the l. 534, with its interest, is deducted. Besides, in *597 the settlement of the estate of Carneal with the new administrator, Coleman charges and is allowed precisely the same sum of money, which equals the amount of the decree and deed of transfer, when that amount is added to the l534 with its interest. This renders it evident, that Coleman paid a part of the consideration, which May, in the deed of transfer of the decree and mortgage acknowledges to have received, by the very tract of land, a moiety of which is decreed to Reynolds and M’Guffin. Add to this that the answer of Coleman is evasive on this subject. He does not venture to swear positively that he paid the whole money. He admits a discount, but alledges he cannot remember what that discount was, when his settlement with Carneal’s administrator de bonis non, would have furnished him with written evidence of the amount, if his memory was treacherous. These circumstances shew that the whole consideration was not money, but that l534 thereof was discharged by the very tract of land, a moiety of which is lost in this suit, in consequence of a prior contract with Carneal the decedent. We, therefore, concur with the court below as to so much of the decree as rescinds the contract relative to Carneal’s moiety of the land.
If two undivided moieties of a tract of land be purchased at different times, and by different contracts, tho’ one contract may be vacated and dissolved, the other, if fair, should stand and be decreed.
But we do not approve the decision of that court which rescinds the contract with Carneal for Phillip’s moiety.— It is true that the first purchase from Carneal, as well as that of Phillip’s half, was of a moiety undivided. But still each contract was distinct and separate. His having procured Carneal’s moiety by a rescision of his old contract with Carneal pro tanto, might have induced him to procure the other half. But whatever might have been his inducements, they were not presented to him by Carneal, nor can he or his heirs be affected by them. That contract seems every way fair. Although he had engaged Carneal to make the contract for him about or at the same time when he purchased the first moiety, and if Carneal was successful in making the purchase from Phillips, he was to have it; yet it is evident, if Carneal was unsuccessful, he was still to keep Carneal's half; and Carneal was not bound to take it back. It is true that both purchases have been somewhat blended by one conveyance; but this does not affect the merits of either purchase. It is urged in the pleadings that the conveyance from Carneal, for the tract of 2800 acres is defective, inasmuch as it is executed by Carneal for *598 himself, and as attorney in fact for Ralph Phillips, and there is no regular letter of attorney authorising Carneal so to act for Phillips. This statement appears to be true; but it is equally clear from the evidence and deed itself, that May was apprised of these defects when he took the deed. For there is a stipulation in the deed, as well as on the back of the patent, providing against these defects, and making Carneal responsible, if Phillips or his heirs should ever claim the land. From this defect May appears to have sustained no injury. Some time after the commencement of this suit Phillips excuted to him a complete release of all his title to the tract of 2800 acres; but he has resisted the acceptance of it without good cause. The half then, which he purchased last from Carneal, as procured for him from Phillips, can still be assigned him, by leaving him to hold the tract of 2800 acres, for which he has a complete title, and if that does not amount to half according to quantity and quality when a proper assignment is made, then the residue of his moiety can be assigned him out of that part of the tract of 3200 acres, which is not decreed to Reynolds and M’Guffin. Or if it shall be deemed more equitable to divide both parts, the moiety of the 3200 acres not assigned to Reynolds and M’Guffin, can be assigned to him, and Carneal’s heirs be decreed to convey it, and the tract of 2800 acres in like manner be divided agreeably to quantity, and quality, and May can be decreed to convey to Carneal's heirs the moiety thereof. There is no difficulty then in giving him his purchase of Philip’s half, and this court conceives it was erroneous to decree to him, the last l534 with its interest as the value thereof. But the first sum of l534 with its interest was correct for Carneal's moiety. It is also assigned for error that, that court ought not to have left the title of the 3200 acres conveyed to May by Coleman in May’s hands. This error seems to be well founded. For as that court decreed a rescision of all the contracts, it ought to have directed May to convey back what title he had gotten under them. And inasmuch as this court approves of so much of the decree of that court as rescinded his first purchase, he ought to be compelled to restore to Coleman and the other heirs of Carneal, such title as he derived from Coleman’s conveyance, and after a division is made according to this opinion, the parties by proper conveyances ought to be directed to complete the partition so as to vest in each the complete legal estate. The decree *599 of the court below must, therefore, be reversed with costs in favor of the heirs of Carneal against May, and the cause remanded for new proceedings to be had in accordance with this opinion.
Hardin for appellant, Haggin for appellee.